# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ROBERT JONES, individually and as a personal representative of the estate of Melvin D. Jones, and KAY JONES, | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| vs. | ) ) | Case No. 07-CV-0606-MJR-DGW |
| DEPUTY SHERIFF BART HILEMAN, SERGEANT RON STAMP, DEPUTY SHERIFF ROBBIE MCGEE, OFFICER JOHN BARR, OFFICER JOHN WRIGHT OFFICER STEPHEN LAWRENCE, OFFICER DALE FOSTER, OFFICER BRYAN WATKINS, CITY OF ANNA, and UNION COUNTY, ILLINOIS, | ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

**REAGAN, District Judge**:

### A. Introduction

On August 27, 2007, Plaintiffs Robert Jones, individually and as the personal representative of Melvin Jones, and Kay Jones filed the above-captioned action stemming from events surrounding the tragic suicide of their son, Melvin Jones, on October 20, 2006 (Doc. 2). On September 30, 2008, the Court dismissed Plaintiffs' wrongful death claims (Count 3) against Defendants Foster, Watkins, Hileman, Stamp, McGee, Union County, and the City of Anna on the

grounds that each is entitled to statutory immunity (Doc. 59).[1]  Additionally, the Court dismissed Plaintiffs' wrongful death claims against Defendants Lawrence, Wright, and Barr on the grounds that each is entitled to state sovereign immunity (Doc. 60).

On November 5, 2008, Plaintiffs filed an amended complaint alleging deprivation of their Fourth Amendment rights under 42 U. S. C. §§ 1983 (Counts 1 and 2), wrongful death (Count 3), and deliberate indifference to a serious medical need (Count 4) (Doc. 69).  Despite the Court's previous finding that the Defendants were immune from the wrongful death claims, Plaintiffs attempted to re-plead them.

On February 2, 2009, the Court again found that state sovereign immunity protects Defendants Lawrence, Wright, and Barr from suit with respect to Plaintiffs' wrongful death claims and dismissed Count 3 as to Lawrence, Wright, and Barr (Doc. 93).  Additionally, the Court found that Defendant Lawrence is entitled to qualified immunity with respect to the deliberate indifference claim and therefore dismissed Count 4 against him.

Lawrence, Wright, and Barr now move for summary judgment on all remaining claims (Doc. 94).  Plaintiffs filed a response in opposition on March 9, 2009 (Doc. 102).  Defendants submitted their reply on March 16, 2009 (Doc. 104).  Having fully reviewed the parties' filings, the Court hereby **GRANTS** the Defendants' motion for summary judgment.

### B.  Factual Background

The following facts are undisputed, unless otherwise indicated.  At approximately 2:00 p.m. on October 20, 2006, Melvin Jones visited his parents' home in a rural area near Anna,

---

[1] In the same Order, the Court also dismissed Plaintiffs' claims under 42 U.S.C. § 1985, which they abandoned in response to the Defendants' motion to dismiss.

Illinois in Union County. His father, Robert Jones, was at home and was babysitting his grandson, Matthew. Soon after arriving, Melvin said he was going to engage in target practice and walked to the backyard with a .22-caliber rifle. At that time, Melvin called 911 and informed the emergency dispatcher that he intended to commit suicide, but wanted an ambulance sent to the residence to ensure that his father, who had a history of heart trouble, could receive medical treatment if needed. Unaware of this call, Robert joined Melvin behind the garage, at which time Melvin informed him of his suicidal intentions.

Robert immediately began to discuss the situation with Melvin, who stated that he was dissatisfied with the course his life was taking and was distraught over the size of medical bills he owed. But while Melvin was willing to talk with his father about these problems, he refused to let go of the rifle and kept his distance from Robert.

Defendants Hileman and Stamp, both Union County police officers, soon arrived at the scene. Robert informed them of the situation, and Deputy Hileman began talking with Melvin. Defendant Barr, an officer with the Illinois State Police (ISP), arrived next. Sergeant Barr immediately called the ISP district headquarters and informed them of the situation so that a Tactical Response Team could be dispatched to the scene (Doc. 95-8, Exh. B, pp. 25-26). He then spoke with Sergeant Stamp regarding the situation and was informed that Melvin was suicidal.

Sergeant Barr was not in uniform, because he was working as an undercover investigator that day. However, Sergeant Barr joined Deputy Hileman, introduced himself to Melvin, and began conversing with him as to why he wanted to commit suicide. Melvin explained the problems he was having and told the officers on multiple occasions that he had no intention of harming anyone other than himself. Sergeant Barr tried to keep the dialogue going in order to

convince Melvin not to kill himself. Sergeant Barr further claims that he wanted to keep Melvin relaxed until a trained negotiator could arrive (Doc. 95-8, Exh. B, p. 36). During the entire period, Melvin alternated between pointing the rifle at himself and laying it across his lap. Meanwhile, more officers continued to arrive at the scene.

Robert also interacted with Melvin and these officers, though at times, he moved towards the house and the driveway, where other officers were arriving. Robert contacted Melvin's girlfriend, Katie, and offered the phone to him so that they could speak to one another. Later, Robert also contacted Wanda Kay Jones ("Kay"), Melvin's mother, but Melvin refused to speak with her.

When Defendant Lawrence arrived, Sergeant Barr informed him that Melvin was holding a rifle and was suicidal. In light of these circumstances, Trooper Lawrence obtained his own rifle and set up a perimeter position behind Melvin's car, where he had a clear line of sight (Doc. 95-14, Exh. D, p. 12). At that point, Trooper Lawrence trained his rifle on Melvin so as to protect the officers on the scene, as well as Robert, just in case Melvin pointed his rifle at anyone (Doc. 95-14, Exh. D, pp. 16, 19, 21).

Defendant Wright soon arrived at the scene and set up an inner perimeter in order to protect the officers and keep civilians out of the area (Doc. 95-17, Exh. F, pp. 12, 15). Sergeant Wright also contacted ISP district headquarters to ensure that the Tactical Response Team, including a trained Crisis Negotiator, would be sent to the scene (Doc. 95-20, Exh. G; Doc. 95-17, Exh. F, p. 12). Sergeant Wright himself had received training as a Crisis Negotiator and had been certified as a Crisis Negotiator during the 1990s (Doc. 95-18, Exh. F, pp. 33–36; Doc. 95-20, Exh. G). However, Sergeant Wright was not certified at the time of the incident at issue here and has not been certified since approximately 2003 (Doc. 95-20, Exh. G).

When Kay Jones arrived, she wanted to go talk to Melvin, but Sergeant Wright prevented her from approaching. In fact, Sergeant Wright informed her that if she attempted to go up there, she would be placed in handcuffs and arrested (Doc. 95-12, Exh. C, p. 21; Doc. 95-18, Exh. F, p. 42). Consequently, Kay remained in the driveway and was never permitted to speak with Melvin.

Meanwhile, the officers claim that Robert was disrupting their efforts to manage the scene and speak with Melvin. At one point, Robert purposely moved into Trooper Lawrence's line of sight so as to block his view of Melvin. Despite Trooper Lawrence's repeated signals to move out of his way, Robert refused to comply with Trooper Lawrence's directions and even flipped him off (Doc. 95-4, Exh. A, pp. 82–86). Consequently, Trooper Lawrence radioed other officers and informed them that Robert was hindering his ability to provide cover.

Additionally, Trooper Lawrence and Sergeant Barr claim that Robert's presence appeared to aggravate Melvin. According to Sergeant Barr, anytime his father approached, Melvin would raise his voice, his grip would tighten on the rifle, and he would point the gun to his own head or chest (Doc. 95-8, Exh. B, pp. 22–24; Doc. 95-9, Exh. B, pp. 30–34). However, when Robert would walk away, Melvin relaxed and placed the gun across his lap (Doc. 95-9, Exh. B, p. 33). Trooper Lawrence claims that he noticed the same behavior from Melvin (Doc. 95-15, Exh. D, p. 27). Robert admits that he probably did contribute to the tension of the situation, but claims it was minimal in comparison to the officers' actions (Doc. 95-4, Exh. A, p. 87).

Additionally, Robert tried to position himself to kick the gun out of Melvin's hand at an inattentive moment, but Sergeant Barr yelled at him to stop, which alerted Melvin to Robert's movements (Doc. 95-4, Exh. A, pp. 76–78). This upset Robert, who thought this might have

worked, but Sergeant Barr tried to explain that he was concerned about an accidental discharge that could hurt Robert, Melvin, or the officers (Doc. 95-4, Exh. A, p. 78–79; Doc. 95-10, Exh. B, pp. 69–71).

The officers decided that Robert should be removed from the scene so that they could speak with Melvin without his interference. The officers claim that they told Robert repeatedly not to go back up to speak with Melvin (Doc. 95-17, Exh. F, p. 21). According to Sergeant Wright, when Robert made yet another attempt to walk toward Melvin in defiance of their orders, he was handcuffed and arrested by other officers (Doc. 95-17, Exh. F, pp. 21–26). Though Sergeant Wright himself did not make the arrest, he helped make the determination that Robert would be arrested if he continued to disobey orders (Doc. 95-17, Exh. F, p. 21).

Robert provides a slightly different version of the events. He does not indicate that he was told to stay away from Melvin. Rather, he says that one of the officers motioned him to come to the driveway to talk about the situation, "and as soon as I got up even with the garage two other deputies flew out of nowhere and put me in handcuffs" (Doc. 95-4, Exh. A, pp. 86–87). Robert claims, however, that he had followed all of the officers' instructions, except when he refused to move out Trooper Lawrence's line of sight (Doc. 95-5, Exh. A, p. 92).

After being handcuffed, Robert was instructed to sit on the ground, but refused to do so because it was wet and he could not physically do it (Doc. 95-4, Exh. A, p. 89). Instead, he offered to sit on the porch steps (Doc. 95-4, Exh. A, p. 89). At that point, an officer was directed to arrest Robert and take him to jail for obstruction of justice (Doc. 95-4, Exh. A, p. 89).

Minutes after Robert was removed from the scene, Melvin fatally shot himself in the chest. Robert was later released, and no charges were ever filed against Robert or Kay.

### C. Legal Standard Governing Summary Judgment Motions

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, **477 U.S. 317, 322-23 (1986)**. **FEDERAL RULE OF CIVIL PROCEDURE 56(a)** provides:

> [Summary judgment] should be rendered if the pleadings, the discovery and disclosure materials on file and any affidavits show that there is no genuine issue as to any material fact that the movant is entitled to as a matter of law.

Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial. *Oest v. IDOC*, **240 F.3d 605, 610 (7th Cir. 2001);** *Moore v. J.B. Hunt Transport, Inc.*, **221 F.3d 944, 950 (7th Cir. 2000).** The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 248 (1986).**

The burden is on the non-moving party to produce specific facts that show a genuine issue for trial. **FED.R.CIV.P. 56(e);** *Moore*, **221 F.3d at 950.** "Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment." *Haywood v. North American Van Lines, Inc.*, **121 F.3d 1066, 1071 (7th Cir. 1997);** *see also* **FED.R.CIV.P. 56(e) ("an opposing party may not rely merely on allegations or denials in its own pleading")**.

In determining whether a genuine issue of material fact exists, the Court views the record in the light most favorable to—and draws all reasonable inferences in favor of—the non-moving party. *Anderson*, **477 U.S. at 255.**

### D. Analysis

**1. Robert Jones's Fourth Amendment Claim under § 1983**

First, Defendants move for summary judgment on Robert Jones's false arrest claim. Robert Jones alleges that these Defendants, acting under color of state law, deprived him of his Fourth Amendment right to be free from unreasonable seizures by arresting him.[2] Defendants raise the defense that they had probable cause to arrest him for obstructing a peace officer.

To establish a *prima facie* case in a § 1983 action based on an officer's unlawful arrest, a plaintiff must prove by a preponderance of the evidence that his arrest was carried out in the absence of probable cause. *See Schertz v. Waupaca County,* **875 F.2d 578, 582 (7th Cir. 1989).** "Probable cause is an absolute defense to a claim of wrongful arrest asserted under section 1983 against police officers." *Wheeler v. Lawson*, **539 F.3d 629, 634 (7th Cir. 2008) (citing** *Wagner v. Wash. County*, **493 F.3d 833, 836 (7th Cir.2007) (per curiam);** *Potts v. City of Lafayette*, **121 F.3d 1106, 1113 (7th Cir.1997)).**

Probable cause to arrest exists where the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Wagner*, **493 F.3d at 836 (quoting** *Michigan v. DeFillippo,* **443 U.S. 31, 37 (1979)) (alteration in original).** The Court must submit the probable cause issue to the jury where reasonable jurors could draw different conclusions regarding the facts or reasonable inferences to be drawn from them. *Wheeler*, **539 F.3d at 634 (citing** *Maxwell v. City of Indianapolis*, **998 F.2d 431, 434 (7th Cir. 1993) (explaining that, "[i]f the underlying facts supporting the probable**

---

[2] The Fourth Amendment protects individuals "against unreasonable searches and seizures."

**cause determination are not in dispute, the court can decide whether probable cause exists").**

Here, Defendants argue that the officers at the scene had probable cause to arrest Robert Jones for the offense of obstructing a peace officer. **720 ILCS 5/31-1** provides: "A person who knowingly resists or obstructs the performance by one known to the person to be a peace officer . . . of any authorized act within his official capacity commits a Class A misdemeanor." Generally, a violation of **§ 5/31-1** requires an act of physical resistance. *See Shipman v. Hamilton*, **520 F.3d 775, 779 (7th Cir. 2008);** *People v. Stoudt*, **555 N.E.2d 825 (Ill. App. Ct. 1990)**. Moreover, "'mere silence' in the face of requests [from the police] for identifying information, or even supplying false information, is not enough to constitute obstruction." *Williams v. Jaglowski*, **269 F.3d 778, 782 (7th Cir. 2001);** *see also People v. Raby*, **240 N.E.2d 595, 599 (Ill. 1968).**

Here, Defendants argue that the officers at the scene had probable cause to arrest Robert Jones for obstructing a peace officer because he (a) refused to follow their orders not to go near Melvin and (b) intentionally blocked Trooper Lawrence's line of sight while Trooper Lawrence was attempting to provide cover for the officers.

With respect to the first allegation, there is clearly a genuine issue of material fact. Defendants claim that even though the officers repeatedly told Robert that he could not approach Melvin inside the perimeter, he refused to comply with their orders. Ultimately, they claim that they arrested Robert when he made yet another attempt to walk to the area where Melvin was located. But Robert disputes this version of events and says that he was arrested while he was *returning* to the driveway after talking to Melvin. He also implies that he was never told to stay away from Melvin, though he is not entirely clear on this point. In any case, he claims that he never disobeyed any order, "other than not moving out of the line of sight of a sniper" (Doc. 95-5, Exh. A, p. 92).

But obviously this statement also leaves no factual dispute with regard to the question of whether Melvin hindered Trooper Lawrence's ability to provide cover. When he noticed that Trooper Lawrence had his rifle trained on Melvin, Robert admits:

> A. I moved over between his path and my boy's path to block his line of sight.
> Q. Did you flip him off?
> A. Yes I did. I stood there and Lieutenant Barr told me to look over my shoulder and I looked over my shoulder and that sniper had his thumb pointed out this way for me to move in this direction so I could move out of the line of fire, I am like what the hell with you, you ain't shooting my son, you have to shoot me in the back I ain't moving, do what you have to.
> . . . .
> Q. When did you flip him off?
> A. Probably about the third time they told me to look over my shoulder, I looked he would tell me to do this, he would give me a funny look and I think the third time I looked I just. . .
> Q. With both fingers?
> A. Both fingers he got the double barrel.

(Doc. 95-4, Exh. A, pp. 83–84).

This conduct obviously creates probable cause that Robert had obstructed a peace officer. By intentionally obstructing Trooper Lawrence's line of sight, and refusing to move after multiple orders to do so, Robert engaged in a physical act by which he hindered Trooper Lawrence's duty to protect other officers on the scene and Robert himself.

Plaintiffs make much of the fact that no one on the scene believed the Melvin had a present intention to harm anyone other than himself. However, that line of reasoning presumes that police officers are only entitled to react at the instant that the threat of violence appears. Obviously, though, Trooper Lawrence's conduct was a necessary precaution taken for the safety of everyone at the scene. Melvin was unstable and was handling a loaded weapon, mere feet from other officers and, at times, his father. The risk of violence was always present, such that were Melvin's already

fragile state of mind to change, it would take no more than a split-second for him to inflict substantial harm on those around him. Without an officer in position to guard against this possibility, everyone at the scene would have been unnecessarily exposed to substantial danger. Therefore, Trooper Lawrence's conduct was clearly an authorized act within his official capacity with which Robert interfered.

Plaintiffs contest that Robert was never charged with any crime, and that no crime was committed. Probable cause, however, "does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." ***United States v. Sawyer*, 224 F.3d 675, 679 (7th Cir. 2000).** Rather, it is only necessary that a reasonable person in the position of the arresting officer would have believed that the suspect has committed an offense.

Accordingly, the Court finds no genuine issue of material fact with respect to whether the officers had probable cause to arrest Robert for obstructing a peace officer. Consequently, summary judgment must be granted in favor of the Defendants on Count 1.

## 2. Kay Jones's Fourth Amendment Claim under § 1983

Defendants next move for summary judgment on Kay Jones's false arrest claim. Kay Jones alleges that the Defendants, acting under color of state law, violated her Fourth Amendment right to be free from unreasonable seizures by preventing her from walking into her backyard to speak with Melvin. Defendants argue that any seizure was reasonable under the circumstances, and thus did not violate the Fourth Amendment.

It is not entirely clear that Kay Jones was ever seized.³ The case law is clear that in order to establish that one has been "seized" within the meaning of the Fourth Amendment, a plaintiff "must demonstrate, from all the circumstances surrounding the incident, that a reasonable person in such a situation would have believed that he was not free to leave." **Belcher v. Norton, 497 F.3d 742, 747–48 (7th Cir. 2007) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).**

Here, however, there is no indication that Kay was not free to leave. Her account of the incident was that

> [t]his guy in a brown uniform with the Smokey the bear hat thing on, comes up to me and he said are you the mother and I said yes and he said don't go any further, don't take another step if you try to go up there I will put you in handcuffs and arrest you for what was it, interfering with a police investigation.

(Doc. 95-12, Exh. C, p. 20). She further testified that she did not know whether they would have permitted her to leave the scene (Doc. 95-13, Exh. C, p. 51). However, this does not amount to a termination of her freedom of movement. There is no indication in the record that should could not leave if she wanted. Her movement was only limited in the sense that she was not permitted to enter the area where Melvin was threatening suicide with a loaded rifle. On the other hand, she claims that an officer was directed to "guard her" in order to "make sure she does not go anywhere" (Doc.

---

³ In the Court's September 30, 2008 Order, the Court stated that the complaint sufficiently alleged that Kay had been seized within the meaning of the Fourth Amendment (Doc. 59). However, the Court was reviewing the complaint under **Rule 12(b)(6)** at that time and merely relied on the allegations in the complaint, which stated that the officers told her "that if she moved she would be put in handcuffs and placed in the back of the car. This officer then told another officer to guard Kay and prevent her from moving" (Doc. 2, ¶ 33). Obviously this finding does not control at the summary judgment stage, as the Court can no longer rely on the pleadings alone.

95-12, Exh. C, p. 24).

Assuming that the officers' actions do constitute a "seizure," however, it was not an unreasonable one. The reasonableness determination starts with the general notion that "[a]n official seizure is ordinarily unreasonable unless it is supported by probable cause." *Jacobs*, **215 F.3d at 772.** *Accord Michigan v. Summers*, **452 U.S. 692, 696 (1981).** Nonetheless, there are a litany of exceptions to the probable cause requirement, and courts must look at the circumstances as a whole in assessing the reasonableness requirement. *White*, **310 F.3d at 995 ("Whether or not a seizure is reasonable under this balancing act is determined by examining the totality of the circumstances.");** *see also Illinois v. McArthur*, **351 U.S. 326, 331-34 (2001).** Indeed, where the circumstances pose a risk to the safety of officers at the scene or others, seizure of the person may be justified. *See Lawrence v. Kenosha County*, **391 F.3d 837, 843 (7th Cir. 2004) (citing Graham v. Connor, 490 U.S. 386, 396 (1989)).**

To the extent that Kay was detained, it was only for her own safety. As explained above, the officers were confronted with an unstable individual holding a loaded weapon and threatening suicide. Though it did not appear that Melvin had a present intent to harm anyone other than himself, it was entirely reasonable for the officers to limit civilian access to the area in order to limit the danger to others in the event that Melvin's state of mind changed for the worse. The Court finds that the officers' refusal to let Kay approach her son was reasonable, given that Melvin was in possession of a loaded rifle, and that he was unstable.

As there are no genuine issues of material fact with respect to this claim, the Court must grant summary judgment in favor of Defendants on Count 2.

### 3. Plaintiffs' Deliberate Indifference Claim

As noted above, Plaintiffs' deliberate indifference claims were previously dismissed as to Defendant Lawrence (Doc. 93). As a result, the Court now turns to Plaintiffs' deliberate indifference claims against Sergeant Barr and Sergeant Wright. Plaintiffs claim that Melvin faced a substantial risk of death by suicide, that he needed mental health treatment, and that the Defendants were deliberately indifferent to this serious medical need. Sergeant Barr and Sergeant Wright argue that Melvin was never in custody, and that even if he was, they are entitled to qualified immunity.

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. ***Estelle v. Gamble*, 429 U.S. 97, 104 (1976);** ***Farmer v. Brennan*, 511 U.S. 825 (1994)**. The obligation to provide medical care arises out of the fact that the State has placed the individual in custody. *See DeShaney v. Winnebago County Dep't of Social Servs.*, **489 U.S. 189, 1005-06 (1989) ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.").** Therefore, the Court first addresses whether Melvin was actually in custody at the time of his death.

The facts create a close call with respect to this question. After the officers arrived at the scene and determined that Melvin was suicidal, they set up a perimeter so as to preclude anyone besides the officers and Robert from contacting him. Eventually, even Robert was removed from the scene, leaving Melvin with Sergeant Barr and Deputy Hileman. Additionally, Trooper Lawrence had his weapon trained on Melvin, and Melvin was aware of this fact. On the other hand,

Defendants make the point that Melvin was not in custody, because he could have ended the encounter by putting down the gun. However, it is not entirely clear from the record that Melvin would have been free to leave, even had he dropped his weapon. Because the record is not entirely developed, and the circumstances at the scene could support a finding that a reasonable person would not feel free to leave, the Court finds that a genuine issue of material fact exists with respect to this question.

Defendants Barr and Wright next argue that even if Melvin was in custody, they are entitled to qualified immunity. The Court uses a two-pronged inquiry to determine if qualified immunity applies. First, the Court determines whether the parties' submissions can establish a violation of a constitutional right. If so, the Court must determine whether those rights were clearly established at the time the violation occurred. **Wilson v. Layne, 526 U.S. 603, 609 (1999);** *see* ***Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000).**

Therefore, the Court first assesses whether the evidence currently before it could support a finding of deliberate indifference. The Supreme Court has recognized that deliberate indifference to the serious medical needs of a detainee may constitute cruel and unusual punishment under the Eighth Amendment. ***Estelle v. Gamble*, 429 U.S. 97, 104 (1976);** ***Farmer v. Brennan*, 511 U.S. 825 (1994)**. This encompasses a broader range of conduct than intentional denial of necessary medical treatment, but it does not include "negligen[ce] in diagnosing or treating a medical condition." ***Estelle*, 429 U.S. at 106;** *see also* ***Jones v. Simek*, 193 F.3d 485, 489 (7th Cir. 1999);** ***Steele v. Choi,* 82 F.3d 175, 178 (7th Cir. 1996), cert. denied, 519 U.S. 897 (1996)**. To prevail on such a claim, a detainee faces two requirements:

> The first one is an objective standard: "[T]he deprivation alleged must be, objectively, 'sufficiently serious.'" *Farmer*, 511 U.S. at

[834], 114 S.Ct. at 1977. As the Court explained in *Farmer*, "a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Id.* The second requirement is a subjective one: "[A] prison official must have a 'sufficiently culpable state of mind,'" one that the Court has defined as "deliberate indifference." *Id*.

***Vance v. Peters*, 97 F.3d 987, 991-92 (7th Cir. 1996),** *cert.* **denied, 520 U.S. 1230 (1997).**

However, the Supreme Court stressed that this test is not an insurmountable hurdle for inmates raising Eighth Amendment claims:

[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. . . . Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Farmer*, **511 U.S. at 842.**

The Seventh Circuit's decisions following this standard require evidence of a defendant's actual knowledge of, or reckless disregard for, a substantial risk of harm. "Neglect of a prisoner's health becomes a violation of the Eighth Amendment only if the prison official named as defendant is deliberately indifferent to the prisoner's health—that is, only if he 'knows of and disregards an excessive risk to inmate health or safety.'" ***Williams v. O'Leary*, 55 F.3d 320, 324 (7th Cir. 1995), cert. denied, 516 U.S. 993 (1995);** *see also Steele*, **82 F.3d at 179 (concluding there was insufficient evidence of doctor's knowledge of serious medical risk or of his deliberate indifference to that risk; emphasizing that even malpractice is not enough proof under** *Farmer***);** *Miller v. Neathery*, **52 F.3d 634, 638-39 (7th Cir. 1995) (applying** *Farmer* **mandate in jury instruction)**. However, a plaintiff need not prove that a defendant intended the

harm that ultimately transpired or believed the harm would actually occur. ***Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996)**.

Defendants admit that Melvin's suicidal condition was serious. However, they argue that the subjective component is not met here, because they did not act with a sufficiently culpable state of mind. The Court agrees. In their complaint, Plaintiffs claim that Sergeant Barr was not qualified to converse with Melvin given his mental state. However, the evidence indicates that Sergeant Barr had at least some experience in working with suicidal individuals (Doc. 95-10, Exh. B, pp. 74–79). Additionally, there is nothing in the record to indicate that Sergeant Barr prevented other qualified officers from engaging with Melvin. In fact, Sergeant Barr called the ISP department headquarters in order to notify them of the situation so that a Tactical Response Team and certified negotiator could be dispatched to the scene (Doc. 95-8, Exh. B, p. 14). As one of the first officers on the scene, Sergeant Barr spoke with Melvin in an attempt "to keep him talking, keep him relaxed, keep the gun off of himself to give tactical response, which I knew was on their way, time to get there for a trained negotiator to get there" (Doc. 95-9, Exh. B, p. 36). Sergeant Barr further indicated that as soon as a trained negotiator arrived, he intended to let them take over in accordance with ISP policy (Doc. 95-9, Exh. B, pp. 40-41).

Of course none of these actions indicate deliberate indifference towards Melvin's medical needs. To the contrary, they were designed to prevent him from self-destruction. Sergeant Barr engaged with him and was able to get him talking about his problems. The fact that he was ineffective does not indicate that he ignored Melvin's needs. On the contrary, he made every effort to help Melvin. Unfortunately, he was not successful.

Similarly, Plaintiffs' claim that Sergeant Wright was deliberately indifferent to

Melvin's needs must fail. There is evidence in the record that Sergeant Wright did have training as a Crisis Negotiator, and had been certified in the past. However, he was not certified at the time of this particular incident, and had not been certified for some time. Instead, he too called to ensure that a Tactical Response Team was on its way so that a trained negotiator could speak with Melvin (Doc. 95-17, Exh. F, p. 12). And while the record is clear that he never communicated with Melvin directly, there is nothing in the record to suggest that he expressly refused to do so. Rather, Sergeant Wright permitted Sergeant Barr and Deputy Hileman to conduct negotiations with Melvin, as they were already involved in this process before Sergeant Wright arrived.

Under the circumstances, Sergeant Wright's conduct does not rise to the level of deliberate indifference. Sergeant Wright's decisions to seek the aid of a certified Crisis Negotiator and to permit Sergeant Barr and Deputy Hileman to continue ongoing conversations with Melvin in the meantime indicates that he did not recklessly disregard the risk of suicide. He followed a course of action that was aimed at keeping Melvin calm until a certified professional could speak with him. This was not unreasonable. Unfortunately, Melvin killed himself before help could arrive.

While the events in this case are incredibly tragic, there is no factual basis to support a finding of deliberate indifference against these particular Defendants. As a result, the Court need not proceed to the second prong of the qualified immunity inquiry. Because the Court finds no genuine issue of material fact with respect to Plaintiffs' claims that Sergeants Barr and Wright were deliberately indifferent to Melvin's medical needs, summary judgment must be granted in favor of these Defendants on Count 4.

### E. Conclusion

Accordingly, for all of the reasons explained above, the Court hereby **GRANTS** Defendants' motion for summary judgment (Doc. 94). The Clerk of the Court shall enter judgment in favor of Defendants Lawrence, Wright, and Barr and against Plaintiffs on all counts.

Plaintiffs claims against all other Defendants remain pending at this time.

**IT IS SO ORDERED.**

**DATED this 29th day of April 2009.**

> **s/ Michael J. Reagan**
> **Michael J. Reagan**
> **United States District Judge**