IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ROBERT JONES, individually and as a personal representative of the estate of Melvin D. Jones, and KAY JONES,<br><br>        Plaintiffs,<br>vs.<br><br>DEPUTY SHERIFF BART HILEMAN, SERGEANT RON STAMP, DEPUTY SHERIFF ROBBIE MCGEE, and UNION COUNTY, ILLINOIS,<br><br>        Defendants. | Case No. 07-CV-0606-MJR-DGW |

## MEMORANDUM AND ORDER

**REAGAN, District Judge**:

### A. Introduction

On August 27, 2007, Plaintiffs Robert Jones, individually and as the personal representative of Melvin Jones, and Kay Jones filed the above-captioned action stemming from events surrounding the tragic suicide of their son, Melvin Jones, on October 20, 2006 (Doc. 2). On September 30, 2008, the Court dismissed Plaintiffs' wrongful death claims (Count 3) against Defendants Foster, Watkins, Hileman, Stamp, McGee, Union County, and the City of Anna on the grounds that each is entitled to statutory immunity (Doc. 59).[1]

On November 5, 2008, Plaintiffs filed an amended complaint alleging deprivation of their Fourth Amendment rights under 42 U. S. C. §§ 1983 (Counts 1 and 2), wrongful death

---

[1] In the same Order, the Court also dismissed Plaintiffs' claims under 42 U.S.C. § 1985, which they abandoned in response to the Defendants' motion to dismiss.

(Count 3), and deliberate indifference to a serious medical need (Count 4) (Doc. 69). Despite the Court's previous finding that the Defendants were immune from the wrongful death claims, Plaintiffs attempted to re-plead them.

On February 2, 2009, Defendants Hileman, Stamp, McGee, and Union County moved for summary judgment on all remaining claims (Doc. 96). Plaintiffs filed a response in opposition on March 9, 2009 (Doc. 103). Having fully reviewed the parties' filings, the Court hereby **GRANTS** the Defendants' motion for summary judgment.

### B. Factual Background

The following facts are undisputed, unless otherwise indicated. At approximately 2:00 p.m. on October 20, 2006, Melvin Jones visited his parents' home in a rural area near Anna, Illinois in Union County. His father, Robert Jones, was at home and was babysitting his grandson, Matthew. Soon after arriving, Melvin said he was going to engage in target practice and walked to the backyard with a .22-caliber rifle. At that time, Melvin called 911 and informed the emergency dispatcher that he intended to commit suicide, but wanted an ambulance sent to the residence to ensure that his father, who had a history of heart trouble, could receive medical treatment if needed. Unaware of this call, Robert joined Melvin behind the garage, at which time Melvin informed him of his suicidal intentions.

Robert immediately began to discuss the situation with Melvin, who stated that he was dissatisfied with the course his life was taking and was distraught over the size of medical bills he owed. But while Melvin was willing to talk with his father about these problems, he refused to let go of the rifle and kept his distance from Robert.

Defendants Hileman and Stamp, both Union County police officers, soon arrived at

the scene. Robert informed them of the situation, and Deputy Hileman began talking with Melvin. Sergeant Stamp primarily remained at the house, either speaking to Robert Jones or else helping other officers secure the scene. Defendant Barr, an officer with the Illinois State Police (ISP), arrived next. Sergeant Barr immediately called the ISP district headquarters and informed them of the situation so that a Tactical Response Team could be dispatched to the scene (Doc. 84-8, Exh. G, pp. 26). He then spoke with Sergeant Stamp regarding the situation and was informed that Melvin was suicidal.

Sergeant Barr was not in uniform, because he had been working as an undercover investigator that day. However, Sergeant Barr joined Deputy Hileman, introduced himself to Melvin, and began conversing with him as to why he wanted to commit suicide. Melvin explained the problems he was having and told the officers on multiple occasions that he had no intention of harming anyone other than himself. Deputy Hileman and Sergeant Barr tried to keep the dialogue going in order to convince Melvin not to kill himself. Deputy Hileman "was in charge of dialogue with Melvin Jones . . . throughout the incident" (Doc. 96-2, Exh. 1, p. 25). Sergeant Barr claims that they hoped to keep Melvin relaxed until a trained negotiator could arrive (*see* Doc. 84-8, Exh. G, p. 36). During the entire period, Melvin alternated between pointing the rifle at himself and laying it across his lap.

Deputy Hileman's only training with suicide prevention was obtained while he studied at the police academy in 1996 (Doc. 96-2, Exh. 1, pp. 43–44). Consequently, his memory of the instruction was "a little hazy," but he did implement his training to the extent that he employed a positive dialogue with Melvin (Doc. 96-2, Exh. 1, p. 44). Deputy Hileman, however, did have prior experience in negotiating with at least one suicidal subject (Doc. 96-2, Exh. 1, pp.

34–35).

While Deputy Hileman and Sergeant Barr spoke with Melvin, Robert also participated in discussions, though at times, he moved towards the house and the driveway, where other officers were arriving. Robert contacted Melvin's girlfriend, Katie, and offered the phone to Melvin so that they could speak to one another. Later, Robert also contacted Wanda Kay Jones ("Kay"), Melvin's mother, but Melvin refused to speak with her.

Meanwhile, Sergeant Stamp and Deputy McGee helped set up a perimeter to secure the scene. When Defendant Lawrence arrived, Sergeant Barr informed him that Melvin was holding a rifle and was suicidal. In light of these circumstances, Trooper Lawrence obtained his own rifle and set up a perimeter position behind Melvin's car, where he had a clear line of sight (Doc. 84-9, Exh. H, p. 15–16). At that point, Trooper Lawrence trained his rifle on Melvin so as to protect the officers on the scene, as well as Robert, just in case Melvin pointed his rifle at anyone (Doc. 84-9, Exh. H, pp. 16, 19, 21).

When Kay Jones arrived, she wanted to talk to Melvin, but Sergeant Wright prevented her from approaching. In fact, Sergeant Wright informed her that if she attempted to go up there, she would be placed in handcuffs and arrested (Doc. 84-10, Exh. I, p. 21; Doc. 84-5, Exh. D, p. 42). Consequently, Kay remained in the driveway and was never permitted to speak with Melvin.

The officers claim that Robert was disrupting their efforts to manage the scene and speak with Melvin. At one point, Robert purposely moved into Trooper Lawrence's line of sight so as to block his view of Melvin. Despite Trooper Lawrence's repeated signals to move out of his way, Robert refused to comply with Trooper Lawrence's directions and even flipped him off (Doc.

84-2, Exh. A, pp. 83–84). Consequently, Trooper Lawrence radioed other officers and informed them that Robert was hindering his ability to provide cover.

Additionally, Trooper Lawrence and Sergeant Barr claim that Robert's presence appeared to aggravate Melvin. According to Sergeant Barr, anytime his father approached, Melvin would raise his voice, his grip would tighten on the rifle, and he would point the gun to his own head or chest (Doc. 84-8, Exh. G, pp. 22–23, 31–32, 34). However, when Robert would walk away, Melvin relaxed and placed the gun across his lap. Trooper Lawrence claims that he noticed the same behavior from Melvin.

Additionally, Robert tried to position himself to kick the gun out of Melvin's hand at an inattentive moment, but Sergeant Barr yelled at him to stop, which alerted Melvin to Robert's movements (Doc. 84-2, Exh. A, pp. 77–78). This upset Robert, who thought this plan might have worked, but Sergeant Barr tried to explain that he was concerned about an accidental discharge that could hurt Robert, Melvin, or the officers (Doc. 84-2, Exh. A, p. 77–78; Doc. 84-8, Exh. G, p. 69).

The officers decided that Robert should be removed from the scene so that they could speak with Melvin without his interference. The officers claim that they told Robert repeatedly not to go back up to speak with Melvin (Doc. 84-5, Exh. D, p. 21). According to Sergeant Wright, Robert made yet another attempt to walk toward Melvin in defiance of their orders, at which point he was arrested (Doc. 84-5, Exh. D, pp. 21–26). Sergeant Stamp and Deputy McGee handcuffed Robert and took him into custody for obstruction of a peace officer (Doc. 96-3, Exh. 2, pp. 53–56; Doc. 96-4, Exh. 3, pp. 45–48).

Robert provides a slightly different version of the events. He does not indicate that he was told to stay away from Melvin. Rather, he says that one of the officers motioned him to

come to the driveway to talk about the situation, "and as soon as I got up even with the garage two other deputies flew out of nowhere and put me in handcuffs" (Doc. 89-2, Exh. A, pp. 86–87). Robert claims, however, that he had followed all of the officers' instructions, except when he refused to move out Trooper Lawrence's line of sight (Doc. 89-2, Exh. A, p. 92).

After being handcuffed, Robert was instructed to sit on the ground, but refused to do so because it was wet and he could not physically do it (Doc. 89-2, Exh. A, p. 89). Instead, he offered to sit on the porch steps (Doc. 89-2, Exh. A, p. 30). At that point, Sergeant Stamp instructed Deputy McGee to transport Robert to the Union County Sheriff's Office (Doc. 96-3, Exh. 2, p. 56; Doc. 96-4, Exh. 3, pp. 43–44).

Minutes after Robert was removed from the scene, Melvin fatally shot himself in the chest. Robert was later released, and no charges were ever filed against Robert or Kay.

### C. Legal Standard Governing Summary Judgment Motions

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. **_Celotex Corp. v. Catrett_, 477 U.S. 317, 322-23 (1986)**. **FEDERAL RULE OF CIVIL PROCEDURE 56(a)** provides:

> [Summary judgment] should be rendered if the pleadings, the discovery and disclosure materials on file and any affidavits show that there is no genuine issue as to any material fact that the movant is entitled to as a matter of law.

Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial. **_Oest v. IDOC_, 240 F.3d 605, 610 (7th Cir. 2001); _Moore v. J.B. Hunt Transport, Inc._, 221 F.3d 944, 950 (7th Cir. 2000).** The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 248 (1986).**

The burden is on the non-moving party to produce specific facts that show a genuine issue for trial. **FED.R.CIV.P. 56(e);** *Moore*, **221 F.3d at 950.** "Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment." *Haywood v. North American Van Lines, Inc.*, **121 F.3d 1066**, **1071 (7th Cir. 1997);** *see also* **FED.R.CIV.P. 56(e) ("an opposing party may not rely merely on allegations or denials in its own pleading")**.

In determining whether a genuine issue of material fact exists, the Court views the record in the light most favorable to—and draws all reasonable inferences in favor of—the non-moving party. *Anderson*, **477 U.S. at 255.**

### D. Analysis

### 1. Plaintiffs' Fourth Amendment Claims under § 1983

"Probable cause is an absolute defense to a claim of wrongful arrest asserted under section 1983 against police officers." *Wheeler v. Lawson*, **539 F.3d 629, 634 (7th Cir. 2008) (citing** *Wagner v. Wash. County*, **493 F.3d 833, 836 (7th Cir.2007) (per curiam);** *Potts v. City of Lafayette*, **121 F.3d 1106, 1113 (7th Cir.1997)).** In the Court's recent Order granting summary judgment in favor of Defendants Lawrence, Barr, and Wright (Doc. 123), the Court determined that the officers at the scene had probable cause to arrest Robert Jones for the offense of obstructing a peace officer. The same reasoning applies here. Consequently, Count 1 must also be dismissed as to Defendants Hileman, Stamp, McGee, and Union County.

In that same Order, the Court found that any seizure of Kay Jones's person was not unreasonable, but rather was only for her safety, given that Melvin was in possession of a loaded

rifle and that he was unstable. Because the same reasoning applies here, Count 2 must be dismissed as to Defendants Hileman, Stamp, McGee, and Union County.

**2. Plaintiffs' Wrongful Death Claims**

Plaintiffs allege that the Defendants are liable for wrongful death because their "willful, wanton, careless, unreasonable, and negligent conduct" did not prevent Melvin's suicide. Defendants argue that the Local Government and Governmental Employees Tort Immunity Act, **745 ILCS 10/4-102, 2-109, and 2-202**, provides immunity for their actions.

The Court previously addressed this argument in its September 30, 2008 Order (Doc. 59). At that time, the Court found that the Defendants were entitled to immunity pursuant to **§ 4-102** and dismissed the wrongful death claims. After reviewing the amended complaint and the evidence in the record, the Court finds that its analysis has not changed—the Defendants are entitled to immunity under Illinois law.

> **Section 4-102** provides:
>
> Neither a local public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide adequate police protection or service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals.

Plaintiffs argue that in responding to Melvin's 911 call, the police were not undertaking "police protection or service," such that § 4-102 does not shield Defendants from liability. Instead, Plaintiffs argue that Defendants' conduct constitutes a "usurpation of responsibilities reserved for medical professionals . . . [which] exceeded recognized notions of police protection services in Illinois." Thus, the question for the Court is whether the police conduct at issue here falls within the category of "police protection or service."

Illinois courts have indicated that police services "include crime prevention, crime investigation, crowd control, searching for missing persons, and traffic control." ***Torres v. City of Chicago*, 816 N.E.2d 816, 819 (Ill.App.Ct. 2004) (citations omitted).** However, "[t]he responsibility for obtaining medical aid for injured persons involves no service characteristic of police functions" and therefore **§ 4-102** does not immunize police officers from liability for conduct purely involving medical services. ***Id.* (citing *Regalado v. City of Chicago*, 40 F.Supp.2d 1009, 1017 (N.D. Ill. 1999)).**

Plaintiffs argue that police came to the scene only to provide medical or mental health services insofar as they were there to either (1) treat Robert Jones for any heart problems that might result during the ordeal,[2] or else (2) to convince Melvin Jones not to commit suicide. However, all of the police officers present at the scene understood that they were dealing with an unstable individual with a loaded weapon. As such, there was an undeniable need to protect other civilians nearby and the officers themselves. Even though the property was located in a secluded, rural area, the complaint makes it clear that Robert Jones and his three-year-old grandson were at the house. Melvin also brought emergency responders onto the scene by calling 911. Later, Kay Jones arrived at the property. Clearly, the police who surrounded the area were there, in part, to ensure the safety of everyone present—as well as anyone who might later arrive—in light of the fact that Melvin was emotionally distraught and was threatening a violent act with a loaded weapon.

This is certainly the function that Sergeant Stamp and Deputy McGee fulfilled, as they had limited or no contact with Melvin whatsoever. There is absolutely nothing in the record

---

[2] This was the purported purpose of Melvin Jones when he made the 911 call in the first place.

to indicate that they were providing medical services or interfering with the provision thereof. Rather, they were there to assist with the protection of the other officers at the scene, as well as the civilians nearby. Their conduct was clearly within the scope of "police services."

Deputy Hileman's conduct creates a closer call, because he had direct contact with Melvin at all times and "was in charge of dialogue with Melvin Jones . . . throughout the incident" (Doc. 96-2, Exh. 1, p. 25). The characterization of his function at the scene as providing mental health services is not entirely inaccurate—indeed, he spoke with Melvin about his problems and sought to dissuade him from committing suicide. But the clear intent was to keep Melvin talking until a trained suicide negotiator could speak with him. The unrebutted evidence in the record also indicates that Deputy Hileman, along with Sergeant Barr, was trying to keep Melvin relaxed for the safety of everyone at the scene. Even though they did not believe that Melvin harbored a present intent to hurt anyone other than himself, they were aware that he was unstable and he was holding a loaded weapon. Obviously, Melvin posed a risk to everyone at the scene. Under the circumstances, the combination of securing the perimeter and communicating with Melvin in an attempt to keep him calm fall within the scope of "police services."

Accordingly, the Court finds that the Defendants are shielded from liability under **§ 4-102.** As a result, the Court must dismiss Count 3 with respect to Deputy Hileman, Sergeant Stamp, and Deputy McGee. And because **745 ILCS 10/2-109** provides that "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable," Count 3 must also be dismissed with respect to Union County.

### 4. Plaintiffs' Deliberate Indifference Claims

The Court now turns to Plaintiffs' deliberate indifference claims. Plaintiffs claim

that Melvin faced a substantial risk of death by suicide, that he needed mental health treatment, and that the Defendants were deliberately indifferent to this serious medical need. The Defendants argue that Melvin was never in their custody, and that even if he was, there are no facts in the record to support a finding that they were deliberately indifferent.

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. ***Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Farmer v. Brennan*, 511 U.S. 825 (1994)**. The obligation to provide medical care arises out of the fact that the State has placed the individual in custody. *See DeShaney v. Winnebago County Dep't of Social Servs.*, **489 U.S. 189, 1005-06 (1989) ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.").** Therefore, the Court first addresses whether Melvin was actually in the Defendants' custody at the time of his death.

The facts create a close call with respect to this question. After the officers arrived at the scene and determined that Melvin was suicidal, they set up a perimeter so as to preclude anyone besides the officers and Robert from contacting him. Eventually, even Robert was removed from the scene, leaving Melvin with Sergeant Barr and Deputy Hileman. Additionally, Trooper Lawrence had his weapon trained on Melvin, and Melvin was aware of this fact. On the other hand, Defendants make the point that Melvin was not in custody, because he could have ended the encounter by putting down the gun. However, it is not entirely clear from the record that Melvin would have been free to leave, even had he dropped his weapon. Because the record is not entirely developed, and the circumstances at the scene could support a finding that a reasonable person

would not feel free to leave, the Court finds that a genuine issue of material fact exists with respect to this question.

However, even if Melvin was in custody, there is no evidence in the record that could support a finding that the Defendants were deliberately indifferent to his medical needs. The Supreme Court has recognized that deliberate indifference to the serious medical needs of a detainee may constitute cruel and unusual punishment under the Eighth Amendment. ***Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Farmer v. Brennan*, 511 U.S. 825 (1994)**. This encompasses a broader range of conduct than intentional denial of necessary medical treatment, but it does not include "negligen[ce] in diagnosing or treating a medical condition." *Estelle*, 429 U.S. at 106; *see also Jones v. Simek*, **193 F.3d 485, 489 (7th Cir. 1999);** *Steele v. Choi,* **82 F.3d 175, 178 (7th Cir. 1996), cert. denied, 519 U.S. 897 (1996)**. To prevail on such a claim, a detainee faces two requirements:

> The first one is an objective standard: "[T]he deprivation alleged must be, objectively, 'sufficiently serious.'" *Farmer*, 511 U.S. at [834], 114 S.Ct. at 1977. As the Court explained in *Farmer*, "a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Id.* The second requirement is a subjective one: "[A] prison official must have a 'sufficiently culpable state of mind,'" one that the Court has defined as "deliberate indifference." *Id*.

***Vance v. Peters*, 97 F.3d 987, 991-92 (7th Cir. 1996),** *cert.* **denied, 520 U.S. 1230 (1997).**

However, the Supreme Court stressed that this test is not an insurmountable hurdle for inmates raising Eighth Amendment claims:

> [A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. . . . Whether a prison official had the requisite knowledge of a substantial risk is a

-12-

> question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

***Farmer*, 511 U.S. at 842.**

The Seventh Circuit's decisions following this standard require evidence of a defendant's actual knowledge of, or reckless disregard for, a substantial risk of harm. "Neglect of a prisoner's health becomes a violation of the Eighth Amendment only if the prison official named as defendant is deliberately indifferent to the prisoner's health—that is, only if he 'knows of and disregards an excessive risk to inmate health or safety.'" ***Williams v. O'Leary*, 55 F.3d 320, 324 (7th Cir. 1995), cert. denied, 516 U.S. 993 (1995);** *see also* ***Steele*, 82 F.3d at 179 (concluding there was insufficient evidence of doctor's knowledge of serious medical risk or of his deliberate indifference to that risk; emphasizing that even malpractice is not enough proof under *Farmer*); *Miller v. Neathery*, 52 F.3d 634, 638-39 (7th Cir. 1995) (applying *Farmer* mandate in jury instruction)**. However, a plaintiff need not prove that a defendant intended the harm that ultimately transpired or believed the harm would actually occur. ***Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996)**.

Defendants admit that Melvin's suicidal condition was serious. However, they argue that the subjective component is not met here, because they did not act with a sufficiently culpable state of mind and responded reasonably to the risk. Plaintiffs, on the other hand, argue that these officers were untrained, and rather than waiting for the Tactical Response Team, they "made the situation worse."

The evidence in the record is fairly clear that the Union County officers had only received basic training in suicide prevention while at the police academy many years prior to the

incident in question. And Deputy Hileman's experience with such negotiations was limited to one prior encounter with a suicidal individual. Thus, the question before the Court appears to be whether these officers' actions of engaging with Melvin, despite their limited training, constitutes deliberate indifference to Melvin's serious medical needs.

The Court finds that there is insufficient evidence to support the Plaintiffs' deliberate indifference claims. First, the evidence indicates that, upon his arrival, Sergeant Stamp only briefly spoke with Melvin. Thereafter, he left all further communications with Melvin to Deputy Hileman and Sergeant Barr. There is nothing in the record to indicate that Sergeant Stamp interfered with or prevented the provision of medical assistance. The same can be said of Deputy McGee, who had absolutely no contact with Melvin whatsoever. It was entirely reasonable for these officers to permit Deputy Hileman and Sergeant Barr to communicate with Melvin after any such negotiations were underway.

Deputy Hileman, on the other hand, did have constant contact with Melvin after arriving on the scene. But there is nothing in the record to support an allegation that he was deliberately indifferent. The evidence indicates that Deputy Hileman had at least some experience in working with suicidal individuals (Doc. 96-2, Exh. 1, pp. 34–35). He also employed at least some of the tactics he learned while at the police academy, even though his "memory of the instruction [was] a little hazy" (Doc. 96-2, Exh. 1, pp. 43–44). Additionally, there is nothing in the record to indicate that Deputy Hileman prevented other qualified officers from engaging with Melvin. In fact, a Tactical Response Team had been contacted and were on their way (*see* Doc. 95-8, Exh. B, p. 14). Deputy Hileman's conversation with Melvin was an attempt to keep him calm until a certified negotiator could arrive. Tragically, Melvin committed suicide before that could happen.

Interestingly, Plaintiffs appear to argue that the officers should not have engaged in any communications with Melvin, but instead should have waited for the more qualified Tactical Response Team to arrive. In other words, Plaintiffs suggest that the officers should have made no attempt whatsoever to dissuade Melvin from committing suicide or otherwise calm him down. But it is unfathomable how Plaintiffs can argue that these officers' earnest attempts to help Melvin amount to deliberate indifference, while a complete disengagement from him would not. To the contrary, the officers' actions were designed to prevent Melvin from undertaking an act of self-destruction. Deputy Hileman engaged with him and was able to get him talking about his problems. The fact that he was ineffective does not mean that he ignored Melvin's needs. The evidence indicates that he made every effort to help Melvin. Unfortunately, he was not successful.

Finally, the Court's finding that no genuine issue of material fact exists with respect to Plaintiffs' deliberate indifference claims against Deputy Hileman, Sergeant Stamp, or Deputy McGee also necessitates dismissal of Plaintiffs' claim against Union County. Plaintiffs argue that Union County was deliberately indifferent to Melvin's serious medical needs by failing to adequately train its employees. Under § 1983, a local governmental entity may be held liable for constitutional violations caused by its own policy or custom. ***Monell v. Dep't of Social Servs.*, 436 U.S. 659, 694 (1978).** However, the Seventh Circuit has clearly explained that "there can be no liability under *Monell* for failure to train when there has been no violation of the plaintiff's constitutional rights." ***Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007).** Here, there is no genuine issue of material fact that could establish that the officers at the scene violated Melvin's rights. As a result, Plaintiffs' claims against Union County must fail.

As no genuine issue of material fact exists, Plaintiffs' deliberate indifference claims

(Count 4) against all remaining Defendants must be dismissed.

### E. Conclusion

Accordingly, for all of the reasons explained above, the Court hereby **GRANTS** Defendants' motion for summary judgment (Doc. 96). The Clerk of Court shall enter judgment in favor of Defendants Hileman, Stamp, McGee, and Union County, and against Plaintiffs.

As no further claims remain pending for decision, this case is **DISMISSED**.

**IT IS SO ORDERED.**

**DATED this 6th day of May 2009.**

**s/ Michael J. Reagan**
**Michael J. Reagan**
**United States District Judge**
